The next case today is United States v. Commonwealth of Puerto Rico, Appeal No. 20-1556, Appeal No. 201805, and Appeal No. 20-115, the, I'm sorry, 20-2115. Attorney Garcia-Sola, please introduce yourself for the record and proceed with your argument. Sorry, I misspoke a little while ago. I should have said good afternoon. May it please the court, my name is Arturo Garcia-Sola, and I will be arguing on behalf of the appellant, Commonwealth of Puerto Rico. Judge Howard, I'd like to reserve two minutes for rebuttal. Yes. Thank you. We are here on appeal from 25 interlocutory orders issued in one of the longest-running consent decree cases in the nation. This case has been pending for 22 years, far longer than we believe is reasonable. As the Department of Justice recently recognized, and I quote, monitorships must be designed and administered with awareness that every dollar spent on monitorship is a dollar that cannot be spent on other policy priorities. The department should thus take a number of steps that will both constrain costs and ensure that monitors are not viewed, rightly or wrongly, as making their monitoring work into a career. And I was from the August 13, 2021 memorandum to attorney general, Mary Garland. I respectfully submit, your honors, that what the memorandum to the attorney general describes is precisely what is happening in this case. Given the time that I have here today, I will be discussing several general topics that apply to all or most of the appeal orders. All of the appeal orders evidence, A, a pattern of disregard for and unilateral modification of the terms of the consent decree in this case, as well as, B, a violation of the commonwealth's due process rights. They also have the effect of an injunction, as they impose upon the commonwealth, the Puerto Rico Department of Health and the Division of Services for People with Intellectual Disabilities, the SBDI, for its Spanish acronym, obligations which are enforceable by contempt and have serious consequences for the commonwealth finances and implication by commonwealth taxpayers and the services rendered by the SBDI to its participants. Let's not forget, as the court is fully aware of, that the Puerto Rico commonwealth is and has been embroiled in the biggest bankruptcy case of a state municipality in the history of the nation. So all of these issues have an impact on the commonwealth. In light of the district court's actions and orders, the commonwealth seeks the court's intervention in determining that the district court has, A, impermissibly and unilaterally modified the terms of the consent decree, B, improperly arrogated itself powers that and laws of Puerto Rico assigned to the secretary of the Department of Health or its designees, including the SBDI director. C, has allowed the Joint Compliance Coordinator, JCCC, initially an individual with expertise in intellectual disabilities, but now an entire office comprised of several attorneys and numerous consultants, unbridled power to program. It would be helpful if you could be specific or at least give us an example of what you're saying, because it's hard to, when you talk about the length of the thing, but there's no objection, there's no appeal based on a denial of ending it or anything like that. So the U.S. concedes that in their view, they think there are four orders that you're appealing from that are appealable, but they say the other 21 are not appealable because they didn't modify or violate the decree. Could you point to one of those 21 specifically as an example that you do say is properly appealable and was objected to below in a timely manner? Sure. Let me point to two examples, all dealing with the same topic, Your Honor. During the COVID-19 pandemic, the court allowed the JCCC to be incredibly active in, as I was saying, superintending the operations of the SBDI. In that connection, Your Honor, the judge issued a number of orders that are grouped under the COVID-19 rubric, which deal with the pandemic and how the SBDI was to deal with or work with the pandemic. I just want to reference two orders, Your Honor. The first one is the alternative isolation order, addendum number 51. In this order, the court imposed upon the SBDI an obligation to meet and agree with the JCCC on a solution to address the isolation of the participants with suspected COVID-19, a matter which is not even a part of the consent decree. The obligation to agree with the JCCC goes beyond the scope of the relationship of the parties with the JCCC, who is supposed to be a compliance monitor, not a receiver, not a trustee. In that order, that order, by the way, was necessary because the judge had issued a prior order requiring the SBDI to open an isolation facility that was very much like a hospital with all the equipment, all the human resources, everything that was required to treat and isolate COVID-19 potential people with contagion in hospital-like facilities, when at the same time in Puerto Rico, there was a scarcity known in Puerto Rico. Are you appealing that order too? You've now talked about a second order. Are you appealing that second order you've just described? We are appealing, actually, the first isolation order and the second, the amended isolation order, Your Honor. Did you object to those below? Yes, we did, Your Honor. Absolutely. How does the first one, it sounds like it's a meet and agreement. It requires a conference with the JCCC. That's usually not the type of order that is appealable on an interlocutory basis. What would be appealable would be if you then didn't reach agreement with the JCCC and the court imposed a substantive requirement that wasn't called for under the consent decree and you then appealed that. That's exactly what happened, Your Honor. But it would be that other order. It wouldn't be the meet and converse. It's the amended isolation order that I'm referring to, Your Honor. After that, but the real issue here, Your Honor, is the fact that the consent decree is being modified to allow the JCCC a role that it doesn't have. Nowhere in the consent decree does it say that I have to sit down with the JCCC to agree or even discuss matters that are operational, administrative matters of the JCCC. Let me just ask a question on this point, just to pick up this question. You've identified 25 orders. We're focusing on 21 of them. Certainly, the U.S. acknowledges jurisdiction, as Judge Chioda said, for four of those which were related to budget, the system and the approach of which appears to be addressed explicitly under the consent decree. But in terms of all of the COVID orders, which I think are the bulk of many of the orders you're appealing here, obviously, no one could have predicted the pandemic. Doesn't this fall into the gray area of the authority of the court to address through their discretion health and safety, which, generally speaking, was the subject of the consent decree? If that's the case, Your Honor, then I think that another approach would have been for the court to sit down, have a hearing with the parties, find out, ascertain as a factual matter what the DSPDI was doing with respect to COVID, how it was preparing for COVID, what protocols it was implementing to deal with the situation. But there was no hearing. There actually was almost no opportunity to be heard here. Had the court done that, had the court held a hearing, even a virtual hearing, as we're doing here today, and tried to ascertain what was happening, what was the DSPDI doing, then it would have been a different story. But there was nothing to that effect. In fact, one of the problems here is that because of the ex parte situation and the policy of the court, to the effect that the court understands that the JCCC can have as many ex parte communications, which then result in informative motions, which then result in orders by the court, the DSPDI and the Commonwealth are not given any contemplating. The court has been contemplating. Again, throughout this time, there have been, the time that's covered in the appeal, there have been two status conferences. By the way, the Secretary of Health asked for a status conference so that he could come into court and inform what the Commonwealth was doing to deal with the matters. That request was never even The Secretary of Health was not given the opportunity to come to court and explain what the Commonwealth was doing. And that's not just with respect to the isolation facility, it's with respect to all of the COVID matters, which resulted mostly from either ex parte communications, informative motions that were filed by the JCCC, and only minutes later, in our brief, we filed, we include a chart, which, you know, interestingly enough, it doesn't say all that much, but it is telling in that, you know, the informative motions will be filed. And minutes after the informative motions were filed, the court will rule upon the motions. What is that? Let me just also ask a practical question, which to me relates most particularly to the COVID set of orders. So assuming the court finds that it has jurisdiction to consider the appeal as to those orders, I wasn't really clear on what the Commonwealth is asking this court to do in regards to those orders, or the marching orders for the district court moving forward, right? I mean, the consent decree is still in place as a practical matter. Presumably, there will be a new presiding judge. What is it that the council is asking this court to do? We're asking for two things, Your Honor. The first is that the court stop modifying the consent decree to allow the JCCC to superintend the officials of the DSPDI in operational matters that are not just COVID related, but are related to transfers, institutionalization of participants and all of that. So we're asking for the first thing, which is the JCCC is a compliance monitor. It is not a receiver, much less a trustee. The objective is for the JCCC to inform the court on the Commonwealth's compliance. So we're asking the court to obey that part of the consent decree. What's the second thing you're asking? The second thing is that it's related to the first. It's that the court stop modifying the consent decree by allowing the JCCC a role that it doesn't have. The court has enlarged the role of the JCCC without having a hearing to determine the need for that, without discussing the matter with the council, for the parties, and without seeking the advice of the Commonwealth. How does the Commonwealth feel about this encroachment into its operation? I'm just trying to understand your answer to Judge Casper's question. Do I have it right? You want us to direct the court to stop making modifications that allow the JCCC to involve itself in operational as opposed to informational aspects. And the second is to stop the court from modifying the consent decree in general? That's correct, Your Honor. Those are the two things. All right, so let me ask, let's give the judges a minute here to decide whether they have additional follow-up of you at this time or would like you to go into any other issues. Judge Cayada? Yeah, I'm still not following the argument. The first order that you gave as an example was the alternative isolation order, which you said is to meet and agree with the JCCC on a solution. Why wouldn't the court be able to? The JCCC had some responsibility for determining whether residents were safe. Your client had some responsibility for determining residents were safe. Things had to happen very fast to keep them safe. But why wouldn't the court be within its authority to order the two of you to sit down and talk? Your Honor, we don't have a is what happens. What else was in that order? Well, what's in the order is the requirement that we sit down, we speak to the JCCC, and at the end of the day, what's going to happen or what was the pattern in the case was that whatever the JCCC said is what the court will rule. That's not due process. That's not an open discussion. Time out. Now you're talking about some other order. I'm having trouble understanding what your problem is with the alternative isolation order. I'm just giving that as an example of what happened in the case, Your Honor. That's not the only... This really doesn't help when you give general sort of notions. We've got to take, you've appealed 25 orders. We've got to look at each one, and we've got to determine whether we have jurisdiction to hear that. And so we need to exactly what your problem is with it. And your brief was not particularly helpful on this degree of specificity. I'm trying to give you a chance here to provide it with respect to the best example you gave the alternative isolation order. I don't see what in that order violates the consent decree. It's the requirement, Your Honor, that we sit down to listen to the JCCC. And the that the court is, as was the case in this case, throughout the time of the relevant to the appeal, the court would end up ignoring the recommendations of the DSPDI and going along with whatever the JCCC decided was the appropriate way to follow. And the isolation plan is a good example, Your Honor, because you know... says that you're to do anything substantively other than to sit down and meet and try to agree. Yes, but the context, the context of the order... If that's it on the order, how am I supposed to reverse that? How are we supposed to say, but don't meet to discuss how to do it? Well, because the issue here is that the court is allowing the JCCC to exercise an authority, an obligation, a duty that he didn't have under the consent decree. The parties did not agree to give that kind of authority, those obligations, those duties to the JCCC. The JCCC is operating more like a receiver. Isn't he supposed to monitor things? Yes, but monitoring is one thing. Operating is the second thing, Your Honor. Why with COVID wouldn't an excellent way of monitoring be to sit down and talk with you and see what it is you think should be done? Again, Your Honor, we didn't have any problem with the monitoring. That's not what was happening here. The JCCC was imposing his way, imposing his beliefs on how the Commonwealth should treat COVID-19 pandemic. And it's not just with the COVID-19 pandemic, for instance. Another example... Before you would just... So there's an order to meet and confer. Did that take place on the isolation order? On the isolation, it did not take place because... Okay, so you haven't had a chance to say no, you're not going to do anything because that's beyond the scope of the consent decree. You just haven't met and conferred. Let me tell you what happened. No, hold on. We're way over time. So I'm going to ask the judges if they want additional questions answered. Sorry. That's all right. Okay, you have reserved some time. And so I'll ask you to mute your devices at this point and we'll hear from Ms. Flynn for the United States. Mr. Garcia, if you could mute your video as well. Thank you. Yes, Ms. Flynn. May it please the court, Aaron Flynn on behalf of the United States. Your Honors, as you have sort of just said, there's a lot going on in this case. I'm happy to turn to the budget orders, the alternate isolation order, the isolation order, the COVID orders and the role of the JCC in this case. But I think it's important first just to take a minute to sort of help frame what was going on in the district court in 2020. And so with the court's indulgence, if I could just take a minute. There have been a lot of attacks on the district court and the JCC. I think there's been a lack of focus on the ongoing challenges to compliance that have required 20 years of and numerous orders to bring about compliance. There have also been a series of court orders and a course of dealings establishing an active hands-on role for the JCC. In addition, the court faced a global pandemic that could have particularly dire consequences for this highly vulnerable at-risk population that quite frankly is dependent on others for their care and lacks the ability to do things like social distancing in congregate care settings that other people could do to protect themselves. And the commonwealth frankly also was not forthcoming with information about its COVID related plans. It did not provide the JCC in the court with its COVID protocol within the established timeframes, nor did it come up with an isolation plan that was responsive to the JCC concerns that were raised with the commonwealth directly. So the court was understandably dissatisfied and frustrated with this concerted effort by the commonwealth to divert its attention from its lack of compliance and to challenge the court's broad authority including the JCC's authority to ensure that the DPSTE participants with whom the court was well familiar were getting appropriate care, services, and support in appropriate numbers and inadequately funded community-based placements as first place or any frustration that the court might have had at the perhaps necessity of this consent decree continuing for 22 years. I guess what I'm most concerned about is sort of the due process rights of the commonwealth, particularly where there, one in the consent decree, I think it's in the supplemental agreement. It does contemplate ex parte communications between the JCC and the parties who presumably have their respective interests in pushing this case forward and not with the court. And to pick up your brother's argument, there seems to be, you know, even with the pandemic, there seems to be a lot of orders not initiated by either party, not initiated by the United States, in which the commonwealth is being directed to do things that have fiscal implications. So I guess just to put the same question to you that I put to your brother, what is it that the district court would be directed to do going forward that you think is different from what they're doing? Well, your honor, we don't think that there are contractual or due process violations here, even putting aside sort of the appealability issues. We think that the district court acted within its broad discretion, certainly as to the budget orders when we're talking about disbursement of funds. You know, those were sort of technical violations. I think that they fall more under administrative housekeeping violations. They did depart from the processes envisioned under the consent decree. But you know, we don't take issue with following the CISA mandated budget process or with having itemized invoices. Those are things that the district court made clear and see that the United States made clear in sealed appendix 316. And I think 332, that that's our preference. And the district court and the JCC actually returned to itemized invoices after five months when both parties made clear that that was their preference. So that's somewhat of a stale issue. As to the ex parte communications and sort of the sua sponte nature of the orders, I think that there is a misrepresentation as to sort of a lack of due process or a lack of opportunity for the Commonwealth to be heard on these issues. Yes, the CISA says that the JCC communications with the court shall consist of participating in court hearings and in chamber meetings, discussions with the parties in meetings and correspondence and reports with copies to the parties. There was a course of dealings in this case for a number of years where there was an expanded role for the JCC that included ex parte communications with the court. The court still was always the decider here and the court sought the Commonwealth's comments and positions before actually ordering the Commonwealth to do something. And so here there was really a lack of being forthright and forthcoming with information, which I think was the valid frustration of the district court last year that the JCC was asking for information consistent with his role under the agreements to ensure compliance with the JCAP. And the Commonwealth was not providing that information in a timely manner. The district court had asked for the COVID protocol. The Commonwealth did not provide the COVID protocol. It didn't proactively sort of supply a COVID protocol. The reason that the district court issued a sua sponte order on isolation was because the JCC found out that there were two suspected COVID cases. The DHPSY participants are largely in congregate settings. And so the district court issued a sua sponte order asking what is the Commonwealth's isolation plan? And when there essentially no isolation plan, the Commonwealth's plan was that if the participants got sick enough, they were going to communicate with their community providers and go to the hospital. The Commonwealth and the court, the court said to the Commonwealth, no, the JCC is correct, that there needs to be an isolation plan. You have to have somewhere to allow the participants or their caregivers for people in sort of foster homes or biological homes to ensure that there isn't a break in the continuity of care, which is the whole sort of impetus of the JCAP. Counsel, what what do you point us to in the various agreements and consent decrees that allows the JCC to have ex parte communications with the court unbeknownst to the parties? I don't think that there is, you know, anything explicit that I can point to the court. Certainly under the CISA, it's appendix 327 to 330. I think when the when the CISA talks about correspondence and report with copies to the parties, that correspondence can encompass informative motions to the court. And certainly the JCC wasn't my question. My question wasn't whether it could communicate with the question was whether it could communicate ex parte. Yeah. So like I said, Your Honor, I don't think there's anything explicit here. I think it goes more to a course of dealings. As the district court himself said, there were numerous orders that he issued in the ex parte communications order. There was numerous earlier orders that the district court issued. Does the United States support continued ex parte communications between the JCC and the district court? Your Honor, I think it's a better practice. It's an opportunity to reset the practice with a different, you know, court here that it's appropriate for communications between the JCC and the court to be sort of with copies to the party. I don't know, you know, what is normal for, for example, magistrate judges and district court judges in terms of communications. I would imagine that there's a certain level of sort of scheduling and procedural type conversations that may be more ordinary course that are ex parte that aren't constantly sort of things in which the parties are privy to. But certainly, if there are substantive matters that the JCC is is reporting to the court on then, you know, that I don't think we object to that being something that the parties are aware of and certainly given an opportunity to weigh in. But of course, here, both parties were given an opportunity to weigh and I don't think that they're in fairness to the court are orders that are suus mante orders without an opportunity for either the Commonwealth or the United States to be heard and what did happen, Your Honor, you know, the parties, for example, in the 2019 budget where the court increased significantly the budget for the JCC's office given ongoing non-compliance. The court, the party said at the status conference, Your Honor, this really runs a foul of sort of the CISA. We are together asking for reconsideration and they, you know, gave a joint proposal to the court, which the court then adopted as the budget for the office of the JCC. And what gave the court the authority to increase the JCC's compensation above that of the magistrate? Your Honor, I think that that is that's a difficult order for us. Out of all orders, it may be the most difficult order for us to defend. Is that a way of saying you have no explanation for why it's justified? No, I don't. I'm not saying I don't have any explanation for why it's justified. It's certainly appealable. You know, we don't think that that order necessarily has to be vacated. The parties were on notice of a possible compensation increase as early as I believe 2018 in response to when the district court was saying that as the parties envisioned, the JCC would be taking on a more active role. And that's an appendix for the agreement. But the agreement provides that the budget goes to the parties for approval and any dispute is worked out by the court. And the budget and the budget. So the compensation is a piece of the to the JCC's compensation, certainly to the budget. Yeah, the budget. So they agreed to the budget. It was still within the 2021 budget. So the compensation sort of line item in the budget, I think was $336,000. There was an asterisk in the 2019 budget. I think this is appendix 533, where the parties laid out that neither and this was when JCC Aceves was in the case and Mr. Castellanos was a deputy JCC. So the $336,000 was covering both of those experienced individuals and the budget order said that no one of their salary should be above $191,000 out of that $336,000 cap. The district court JCC Aceves was then out of the case he had resigned and Mr. Castellanos had moved into the JCC role by the time that the district court increased his compensation. I'm not going to say that that was an abuse of discretion, Your Honor, he was assuming more responsibility. He was the experienced person on the case. He did not have Dr. Aceves there anymore. And it was response to the JCC taking on a more active role as contemplated by the parties. At bottom, we don't object to sort of revisiting the compensation anew or in next year's budget. We don't see sort of issues with doing that given sort of the collaborative and cooperative spirit we're now experiencing in the district court. And so you know, I don't kind of want to get stuck on the compensation issue. Because I think it's something that's here. I know that some of our questions were focused on the COVID orders. But there are also orders that I know your brother argues are sort of beyond the scope of what was provided for in the consent degree in terms of being in the weeds of operations. And the orders that come to mind are the orders that I think were concerning a particular participant or a particular person. This is participant 156 order, ordering that this participant be kept in his current home, the reinstitutionalization orders. Is it the U.S.'s view that that's within the consent decree and in committed to the discretion of the district court to make directions about a particular individual participant in this program? Yes and no, Your Honor. So I think that what those orders are doing are ensuring that the Commonwealth is complying with the provisions of the JCAP. So it's certainly within the district court and the JCCC's authority. And it's not super intending sort of operation of the DPSTE program in any way. But pursuant to the JCAP, there's supposed to be individualized planning that takes place before any singular participants transfer. And so the sort of impetus of those orders is not to kind of exercise or supplant the sort of role of the DPSTE program. It's to ensure that DPSTE is actually undertaking the interdisciplinary team evaluations and the individualized training of transition planning that's mandated under the JCAP. And this is participants with extremely individualized needs. They can not do lots of things for themselves. And this is a difficult thing that if participants are transferred, you don't just unwind that for this population. And I think that that was something that the district court was very familiar with and knew. And for participant 156, that participant had specific needs that were laid out in the confidential appendix. And the district court said that he expects the matter can ultimately be resolved by the JCCC, the DPSTE in the United States. So I think this was really assuring that the JCAP provisions were followed with more than any sort of supplanting of the DPSTE program sort of evaluation team. As to that order in particular, I would also just note that it's moot because the district court granted an urgent motion to transfer that participant. That's a confidential appendix 361. So this was an issue where the JCCC had learned of the participants transfer not from DPSTE, but from the participant himself. And so the district court really wanted to ensure that the proper planning was taking place, both in terms of the participant himself and the conditions of the sort of home that he would be moved to given this participant's particular needs and specific needs. Follow-up questions from the court? Why don't you take a minute and wrap up, counsel? Yes, your honor. I just wanted to say so that cases repeatedly recognized that courts don't have to enter decrees and hope for compliance, especially in contexts such as this one. The district court has broad authority to effectuate the consent decree. That's what the district court did here. This court should affirm where it has jurisdiction, dismiss where it lacks jurisdiction, and deny mandamus relief. Thank you. Thank you. Mr. Garcia, rebuttal? Mr. Garcia, would you unmute your audio and video? I'm sorry. I started to speak without unmuting myself and the camera. Okay. Can you see me now? Yes. Can you hear me now? Yes, you may proceed. Sorry. Let me turn to participant 156 order. That's a good example, another good example of the court issuing an order without having a hearing. If the court had any doubts about what was happening with participant 156, what it should have done is issue an order for a hearing, call a hearing. Instead, it relied upon information that it received from the JCCC ex parte without giving us the opportunity to respond to that information, and then it issued its order. But no effort was made to ascertain what was truly happening with that participant. And in fact, the DSBDI was working on a plan to transfer that participant. And the reason why the participant had to be transferred is because he was at risk to his own security. That's why we have to file an urgent motion, your honor. The other thing that I want to say just quickly is that it is not correct that the Commonwealth was not forthcoming with a COVID-19 plan or an isolation plan. Those two protocols, it was submitted at 7.44 p.m. The day goes from, you know, until midnight. So it was submitted on the day that it was due. The court has said that it was submitted late because it was submitted at 7.44. That to us is not a late submission. But with respect to the isolation plan, the Commonwealth also submitted an isolation plan. And instead, the court approved the isolation plan, which included the provisions that I mentioned before about creating a hospital-like facility for the participants, their family members, and the providers. Again, that's not within the CISA requirements as to what the JCCC was supposed to be doing. The JCCC was being allowed by the court to do much more than the parties and in particular the Commonwealth bargained for. The other thing that I want to state is that it is not correct, respectfully to my sister counsel Flynn, that the JCCC has gone back to submitting itemized invoices. That is not correct. The JCCC continues to submit invoices that are not itemized. And the expenses on the increase at a time when the Commonwealth continues to be in bankruptcy. Lastly, the USA at another point in time during the course of the case did complain about expired communications. It's only more recently that they have decided that that was not really a problem. But the parties agreed in the CISA that the JCCC could not have any expired communications with the court. It could have expired communications with the parties. And the inverse is what's happening here. And that's where many of the grievances that the Commonwealth has emanated from because too many orders are issued without giving the opportunity to the Commonwealth to opine about those orders. And also, there have been no evidentiary hearings. One order that comes to mind in particular, and I will wrap, the court entered a ruling based on a finding that there was an Olmstead violation when there was absolutely no hearing to determine whether there was an Olmstead violation or whether there was a need to stop participants from being transferred from institutions into community homes, which at the end of the day is the ultimate objective of the consent decree. Here, we were going the other way around. By the way, decisions to transfer people into and out of institutional institutions are based on the adequate treatment and are based on the recommendations given by the professionals, by the health professionals. That's not what's happening in that particular order. It was, again, the result of an ex parte communication based on a finding that was made as part of an evidentiary hearing. This is a good place to leave the argument, counsel. Thank you. Thank you very much. Sorry for the passion. That concludes the arguments for today. The session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you should disconnect from the meeting at this time.